J-A11002-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| MICHAEL L. & GRETA GUIGLEY | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellants | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MICHAEL J. ABBOUD, M.D., PENN | : | No. 1130 MDA 2025 |
| STATE ST. JOSEPH MEDICAL CENTER | : | |
| AND BRIAN BROWAREK | : | |

Appeal from the Order Entered July 18, 2025
In the Court of Common Pleas of Berks County Civil Division at No(s):
20-17478

BEFORE:  BECK, J., NEUMAN, J., and BENDER, P.J.E.

MEMORANDUM BY BECK, J.:                    **FILED JUNE 30, 2026**

Michael L. and Greta Guigley ("the Guigleys") appeal from the order entered by the Berks County Court of Common Pleas granting summary judgment in favor of Michael J. Abboud, M.D., Penn State St. Joseph Medical Center ("Medical Center"), and Brian Browarek ("Browarek") (collectively, "Defendants"), and dismissing the Guigleys' complaint with prejudice.  On appeal, the Guigleys argue that the trial court erred in determining that they could not establish a prima facie case of negligence in this medical malpractice action because they failed to present any expert testimony in support of their claims.  They assert that the doctrine of res ipsa loquitor precludes summary judgment in this matter.  Because we discern no error in the trial court's

conclusion that the doctrine of res ipsa loquitor is inapplicable to this case, we affirm.

The trial court summarized the facts and procedural history of this case as follows:

> After initiating this action by writ of summons, [the Guigleys] filed a complaint on January 11, 2021, alleging professional negligence individually against [Dr. Abboud] and with imputed liability against [Medical Center] as to Michael Guigley ("Michael") and including a claim for loss of consortium for Greta Guigley ("Greta")[.] [Medical Center and Dr. Abboud] filed preliminary objections, which were sustained by the [trial court] and thereafter, on December 23, 2021, the Guigleys filed a first amended complaint.
>
> The Guigleys' claims originate from Michael's admission and subsequent treatment at [the] Medical Center in November of 2018. The Guigleys allege that Michael was admitted to the Medical Center on November 3, 2018, for diverticulitis, bowel perforation, and sigmoid colon perforation due to the diverticulitis and that a CAT scan of Michael's abdomen and pelvis were ordered on November 6, 2018. Concomitant with the CAT scan, Michael was ordered to receive the adjuvant contrast dye through oral administration by [Dr. Abboud]. The Guigleys assert that upon ingesting the contrast dye, Michael began experiencing "significant and excruciating pain, a feeling of a vibration which was in the abdomen and moved up his body to his head and neck[.]" [Amended Complaint, 12/23/2021, ¶ 18]. The Guigleys further state that Michael felt "bloated and uncomfortable" after drinking the contrast dye, and that "[h]e felt that something popped in his abdomen[,]" and that he "thought he was going to die." *Id.* ¶ 22. Shortly thereafter, Michael was taken for the CAT scan and then into surgery, performed by Dr. Abboud, which the Guigleys claimed was described "as an exploratory laparotomy, and creation of end colostomy (Hartman's procedure)." *Id.* ¶ 29. While still admitted, Michael returned to surgery for "superficial wound infection status post exploratory laparotomy … described as reopening of recent laparotomy, washout/irrigation of abdominal cavity and abdominal wound, sharp excisional debridement of skin, subcutaneous fat, abdominal wall fascia, facial closure, and placement of wound packing." *Id.* ¶ 30.

Michael was then discharged on November 17, 2018. The Guigleys further assert that Michael "underwent subsequent medical care and treatment including reversal of the colectomy." *Id.* ¶ 31.

Specifically, the Guigleys allege that Dr. Abboud and the Medical Center, vicariously through Dr. Abboud, were professionally negligent in, among other things, failing to timely perform surgery, failing to timely undertake medical intervention, and "failing to timely and appropriately treat [Michael] to prevent further deterioration of his diverticulitis and/or perforated colon[.]" *Id.* ¶ 34(f). The Guigleys likewise claim that Dr. Abboud and the Medical Center were negligent in ordering the CAT scan with the administration of the oral contrast dye, which led to the pain, suffering, and other damages borne by Michael, and pursuant to such injuries, the loss of consortium suffered by Greta.

\* \* \*

[Medical Center and Dr. Abboud] filed a praecipe to issue writ to join additional defendant on February 18, 2022, to join additional defendant [Browarek.[1]] The matter proceeded through the next two years with slight interaction with the [trial court] as the court understood discovery to be progressing.

Upon unopposed motion of [Medical Center and Dr. Abboud, the trial court] scheduled a settlement conference on January 6, 2025, after which [the court] entered a case management order setting this matter for a three-day trial beginning October 14, 2025. The January 7, 2025 case management order further set the deadline for discovery to be completed by March 31, 2025 and allowed for the Guigleys to produce their expert reports no later than April 30, 2025, with all Defendants to produce their expert reports no later than May 30, 2025. Likewise, all dispositive motions were due no later than June 30, 2025.

After the conference with [the trial court], at which counsel for Browarek attended, [Medical Center and Dr. Abboud] eventually filed a joinder complaint on March 31, 2025, joining

---

[1] Browarek was allegedly involved in the administration of the contrast dye to Michael. *See* Amended Complaint, 12/21/2023, ¶ 28.

[Browarek as a defendant]. *See* Def.'s Joinder Complaint. Browarek filed an answer and new matter on April 21, 2025, to which [Medical Center and Dr. Abboud] filed a reply to new matter on May 12, 2025.

On May 5, 2025, [Medical Center and Dr. Abboud] filed their motion for summary judgment[.] On May 14, 2025, Browarek filed a joinder to [the summary judgment motion], asserting that the [trial court]'s grant of the motion would obviate the sole "Indemnification and/or Contribution" claim asserted in the joinder complaint. *See* Add'l. Def.'s Joinder to MSJ. The Guigleys filed an answer to the [motion for summary judgment] on June 4, 2025. The matter was thereafter scheduled for argument … on July 7, 2025.

Trial Court Opinion, 7/18/2025, at 2-4 (cleaned up).

On July 18, 2025, the trial court granted Defendants' motion for summary judgment and dismissed the Guigleys' complaint. The Guigleys timely appealed to this Court. They present the following single issue for review: "Did the trial court err in granting [Defendants'] motion for summary judgment[,] as material issues of fact exist regarding [the Guigleys'] claims? The Guigleys' Brief at 6 (unnecessary capitalization omitted).

We review a trial court's grant of summary judgment pursuant to the following standard:

In reviewing an order granting summary judgment, our scope of review is plenary, and our standard of review is the same as that applied by the trial court. Our Supreme Court has stated the applicable standard of review as follows: An appellate court may reverse the entry of summary judgment only where it finds that the lower court erred in concluding that the matter presented no genuine issue as to any material fact and that it is clear that the moving party was entitled to a judgment as a matter of law. In making this assessment, we review the record in the light most favorable to the nonmoving party, and all doubts as to the existence of a genuine issue of material fact must be resolved

- 4 -

against the moving party. As our inquiry involves solely questions of law, our review is de novo.

Therefore, our responsibility as an appellate court is to determine whether the record either establishes that the material facts are undisputed or contains insufficient evidence of facts to make out a prima facie cause of action, such that there is no issue to be decided by the fact-finder. If there is evidence that would allow a fact-finder to render a verdict in favor of the non-moving party, then summary judgment should be denied.

*Caterpillar Fin. Servs. Corp. v. Get 'Er Done Drilling, Inc.*, 286 A.3d 302, 305-06 (Pa. Super. 2022) (citation omitted).

The Guigleys argue that the trial court erred in granting summary judgment in favor of Defendants. *See* The Guigleys' Brief at 13-51. Although they acknowledge that medical malpractice claims generally require the presentation of expert testimony and that they did not provide any such evidence to the trial court, the Guigleys contend that the doctrine of res ipsa loquitur "should have forestalled the grant of summary judgment to [Defendants]." *Id.* at 13. The Guigleys assert that Michael's deposition testimony sufficiently describes medical malpractice that occurred relating to the administration of contrast dye prior to his CAT scan, and that his medical records allegedly failed to properly document any issues that occurred with respect to his treatment. *Id.* at 14. They maintain that the lack of complete medical records creates an adverse inference against Defendants and that a jury could, "weighing the testimony of [Michael,] … find the lack of accurate medical records is evidence unfavorable to one or more of the [defendants]

and infer that negligence occurred[,]" making this matter appropriate for the application of the doctrine of res ipsa loquitur. *Id.* at 14-15.

The parties and the trial court agree that the general rules applicable to medical malpractice claims and the doctrine of res ipsa loquitur are set forth in our Supreme Court's decision in ***Toogood v. Owen J. Rogal, D.D.S., P.C.***, 824 A.2d 1140 (Pa. 2003). In ***Toogood***, the Supreme Court explained that under Pennsylvania law, medical malpractice is "broadly defined as the unwarranted departure from generally accepted standards of medical practice resulting in injury to a patient, including all liability-producing conduct arising from the rendition of professional medical services." *Id.* at 1145. "[T]o prevail in a medical malpractice action, a plaintiff must establish a duty owed by the physician to the patient, a breach of that duty by the physician, that the breach was the proximate cause of the harm suffered, and the damages suffered were a direct result of the harm." *Id.* (citation and quotation marks omitted). Importantly, "[b]ecause the negligence of a physician encompasses matters not within the ordinary knowledge and experience of laypersons[,] a medical malpractice plaintiff must present expert testimony to establish the applicable standard of care, the deviation from that standard, causation[,] and the extent of the injury." *Id.* Put another way, the general rule under Pennsylvania law is that expert testimony is necessary for a plaintiff to establish a prima facie case of negligence in a medical malpractice case. ***See id.***

The **Toogood** Court recognized a "very narrow exception" to the expert testimony requirement, the doctrine of res ipsa loquitur, which applies when "the matter is so simple or the lack of skill or care so obvious as to be within the range of experience and comprehension of even nonprofessional persons." **Id.** (citation omitted).

> The doctrine of res ipsa loquitur allows plaintiffs, without direct evidence of the elements of negligence, to present their case to the jury based on an inference of negligence. The key to the doctrine is that a sufficient fund of common knowledge exists within a jury of laypersons to justify raising the inference. Instead of directly proving the elements of ordinary negligence, the plaintiff provides evidence of facts and circumstances surrounding his injury that make the inference of the defendant's negligence reasonable. The gist of res ipsa loquitur … is the inference, or process of reasoning by which the conclusion is reached. This must be based upon the evidence given, together with a sufficient background of human experience to justify the conclusion. It is not enough that plaintiff's counsel can suggest a possibility of negligence.

**Id.** at 1146 (quotation marks and citation omitted).

"Historically, res ipsa loquitur has had a limited role in medical malpractice cases[.]" **Id.** Our Supreme Court stated that because "medicine is not an exact science," important factors for consideration in determining whether medical negligence occurred included "that the human body is not susceptible to precise understanding, that the care required of a medical professional is the degree of learning and skill common in his profession, and that, even with the greatest of care, untoward results do occur in medical and surgical procedures[.]" **Id.** at 1146-47. Thus, the Court explained that courts "in medical malpractice cases require detailed expert testimony because a jury

of laypersons generally lacks the knowledge to determine the factual issues of medical causation; the degree of skill, knowledge, and experience required of the physician; and the breach of the medical standard of care." *Id.* at 1149. Thus, the Court observed that the res ipsa loquitur exception must be "carefully limited," because "to say whether a particular error on the part of a physician reflects negligence demands a complete understanding of the procedure the doctor is performing and the responsibilities upon him at the moment of injury." *Id.* It thus held:

> [T]hree conditions must be met before the doctrine of res ipsa loquitur may be invoked: (a) either a lay person is able to determine as a matter of common knowledge, or an expert testifies, that the result which has occurred does not ordinarily occur in the absence of negligence; (b) the agent or instrumentality causing the harm was within the exclusive control of the defendant; and (c) the evidence offered is sufficient to remove the causation question from the realm of conjecture, but not so substantial that it provides a full and complete explanation of the event.

*Id.* at 1149-50. "It is only when each of the three conditions is satisfied that an inference of negligence can be drawn from the occurrence of an injurious event." *Id.* at 1150.

In rejecting the Guigleys' arguments, the trial court explained:

> … The Guigleys seek, without expert testimony, to have the matter proceed to the jury, and apparently to have the jury determine all Defendants' liability based on discrepancies between Michael's own testimony and the account that is contained it [in t]he medical records. But even if a jury were to believe Michael's testimony that he suffered certain symptoms upon ingesting the contrast dye, it is far outside the ken of the layperson to determine the correct amount of contrast dye that should be prescribed prior to a CAT Scan, or whether the symptoms Michael allegedly

suffered were consistent with and caused by the condition—the bowel perforation—later discovered by the CAT scan and subsequent surgery. Moreover, the Guigleys have failed to eliminate any other possible explanation or cause for the symptoms that Michael suffered.

When asked to proffer what evidence the Guigleys would present to a jury to support allegations of deviations from the applicable standard of care, the Guigleys' counsel replied that he believed that there was an excess amount of contrast medium administered and that the records were sanitized because they merely reflected that Michael reported discomfort and they did not sufficiently characterize Michael's reaction to the contrast medium that he had testified to in his deposition testimony. …

Absent an expert witness to rebut [Defendants]' position that the symptoms Michael described are congruous with perforation of the bowel and that all treatment was consistent with the applicable standard of care, the Guigleys, as a matter of law, cannot meet the burden of proving their contrary allegations by a preponderance of the evidence.

Trial Court Opinion, 7/18/2025, at 9-11 (unnecessary capitalization omitted).

The record reflects that during his deposition, Michael testified that Dr. Abboud had ordered a CAT scan with contrast dye because he had a small bowel perforation and the doctor wanted to determine its exact location. The Guigleys' Response to Defendants' Motion for Summary Judgment, 7/1/2025, § III (Deposition of Michael Guigley, 8/7/2023, at 39). He stated that a female hospital staff member gave him a "large" (approximately two-liter bottle[2]) amount of contrast dye to ingest prior to the CAT scan. *Id.* at 39, 113-14.

_____

[2] Although Michael testified at his deposition that he ingested two liters of contrast, in their brief before this Court, the Guigleys state that he ingested only 400 milliliters of contrast. *See* The Guigleys' Brief at 9.

- 9 -

Michael described the contrast dye as difficult to drink because of its thickness and poor taste, and he stated that it took him roughly two hours to ingest the entire bottle. *Id.* at 40-44. Michael stated that roughly ten to fifteen minutes after he finished ingesting the contrast dye, he felt very uncomfortable and was in excruciating pain, and that is when he believes that the contrast dye "broke [his] intestines." *Id.* at 40. Michael testified that after he received medicine for the pain, he had the CAT scan, which is when he learned that his intestine had burst and that he had to have emergency surgery to repair the rupture, which resulted in him needing a colostomy bag. *Id.* at 47-52.

Michael further testified that after his emergency surgery he suspected the Medical Center may have given him too much contrast dye to ingest before his CAT scan. *Id.* at 89-90. On that hunch, he reached out to a friend who was a pharmacist to see if she knew how much contrast dye he should have received, but she told him she was unaware of the appropriate dosage. *Id.* Similarly, Michael stated that his own internet research failed to yield any answers regarding how much contrast dye he should have ingested. *Id.*

Nothing in Michael's deposition testimony demonstrates the presence of any of the three conditions that would permit the application of res ipsa loquitor to this case. *See Toogood*, 824 A.2d at 1149-50. There is nothing to even suggest that the result that occurred does not ordinarily occur in the absence of negligence, that the instrumentality causing the harm was within

the exclusive control of Defendants, or that there was sufficient evidence to remove the causation question from the realm of conjecture. *See id.*

Rather, Michael's testimony reflects that he experienced discomfort and pain after he ingested the contrast dye, he thought he was given too much contrast dye, and that this discomfort led him to conclude that ingesting the contrast dye caused his intestine to burst and the need for emergency surgery. *See* N.T., 8/7/2023, at 39-52. The Guigleys, however, provided no foundation or support, other than Michael's own speculative lay testimony, for the contention that he was given too much contrast die, let alone that this caused his intestinal burst and need for emergency surgery. Not only did they fail to establish that he did, in fact, ingest more contrast dye than was medically indicated, they failed to present any evidence eliminating Michael's underlying medical conditions as the cause of his intestinal injury. *See* The Guigleys' Brief at 13-51. This is critical because in their complaint, the Guigleys admitted that Michael suffered from diverticulitis and that he was admitted to the Medical Center with colon and bowel perforations related to that condition. *See* Amended Complaint, 12/23/2021, ¶ 15. Thus, it is entirely unclear from the record whether the bursting of Michael's intestine was from a pre-existing condition, the contrast dye, or something else entirely. In short, there is no evidence of record that anything Defendants did caused any harm to Michael or that their actions or inactions were even the cause of the discomfort and pain he experienced.

At bottom, the Guigleys argue that they are entitled to recovery based on Michael's lay perception of what occurred while he was in the hospital without any expert testimony to support this contention. As there is nothing in the record that would allow for a finding in favor of the Guigleys' claim of negligence against Defendants, we discern no error in the trial court's conclusion that the doctrine of res ipsa loquitor was inapplicable in this case. **See Toogood**, 824 A.2d at 1149-50

We also find unavailing the Guigleys' argument that Michael's medical records, which do not document any concerns related to the administration of the contrast dye, created an adverse inference against Defendants such that their case should survive Defendants' motion for summary judgment. In support of this argument, the Guigleys' rely on the doctrine of spoliation of evidence. **See** The Guigleys' Brief at 14.

"'Spoliation of evidence' is the failure to preserve or the significant alteration of evidence for pending or future litigation." **Parr v. Ford Motor Co.**, 109 A.3d 682, 701 (Pa. Super. 2014) (citation omitted). "[T]he spoliation doctrine is broadly applicable to cases where 'relevant evidence' has been lost or destroyed." **Mt. Olivet Tabernacle Church v. Edwin L. Wiegand Div., Emerson Electric Co.**, 781 A.2d 1263, 1269 (Pa. Super. 2001). "The duty to retain evidence is established where a party knows that litigation is pending or likely and it is foreseeable that discarding the evidence would be prejudicial to the other party." **Marshall v. Brown's IA, LLC**, 213 A.3d 263, 268 (Pa.

Super. 2019) (citation and internal quotation marks omitted). "Spoliation may be negligent, reckless, or intentional; a party's bad faith, or lack of it, in the destruction of potentially relevant evidence goes to whether and what type of sanction should be imposed, not whether spoliation occurred." ***Id.*** at 271.

The record establishes that Michael's medical records reference that he experienced discomfort following his CAT scan. ***See*** The Guigleys' Response to Defendants' Motion for Summary Judgment, 7/1/2025, Ex. P-5. Michael's medical records, however, do not reference that he began experiencing this pain after ingesting the contrast dye nor do they indicate that the contrast dye was the cause of his pain and discomfort. ***See id.***

The Guigleys' conflate the Medical Center's lack of documentation relating to the discomfort and pain Michael allegedly experienced after ingesting the contrast dye with the spoilation of evidence. The Guigleys' do not even allege that Defendants lost, altered, or destroyed evidence relating to this litigation, let alone that they did so in bad faith. ***See*** The Guigleys' Brief at 14-15, 51. Furthermore, as Defendants note, during the pendency of this litigation, the Guigleys did not serve any written discovery requests on Defendants and "have never requested production of [Michael]'s medical record from the [Medical Center] during the pendency of this litigation, having presumably received medical records prior to the pendency of this action." Defendants' Brief at 46. It is unclear, therefore, based on the record before us, whether the Guigleys obtained and presented the entirety of Michael's

medical records from this incident to the trial court. Thus, the doctrine of spoliation of evidence is wholly inapplicable to this case and cannot serve as a basis for the Guigleys to avoid summary judgment.

Based on the foregoing, we conclude that the trial court did not err in determining that there were no disputed material facts, that Defendants were entitled to judgment as a matter of law, and granting their motion for summary judgment on that basis.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 06/30/2026